Filed 7/24/13

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| In re JESUS G., a minor,<br><br>on Habeas Corpus. | B245823<br><br>(Los Angeles County<br>Super. Ct. No. PJ48832) |

ORIGINAL PROCEEDING, petition for writ of habeas corpus. Fred Fujioka, Judge.  Petition dismissed as moot.

Ronald L. Brown, Los Angeles County Public Defender, Albert J. Menaster, Rebecca Barnhart and Megan N. Gallow, Deputy Public Defenders, for Petitioner.

Collins Collins Muir + Stewart, Eric Brown, Tomas A. Guterres and Melinda W. Ebelhar for Respondent County of Los Angeles Department of Probation.

_____

Jesus G., a minor (born January 1998, hereinafter Jesus), represented by the Los Angeles County Public Defender's Office, filed a petition for writ of habeas corpus on December 21, 2012, for his release from Central Juvenile Hall. Jesus was the subject of a wardship petition pursuant to Welfare and Institutions Code section 602 and was placed in juvenile hall. At a September 2012 hearing he was found incompetent to stand trial and remained detained. We initially denied the petition on January 9, 2013, and Jesus filed a petition for review with the Supreme Court.

The Supreme Court granted the petition for review on February 27, 2013. It ordered this court to vacate the January 9th order denying habeas relief and directed us to issue an order to show cause why Jesus' prolonged detention without the provision of services was not in violation of the protocol issued by the Los Angeles Superior Court Juvenile Division and did not otherwise deny Jesus due process of law.

On March 6, 2013, we issued an order to show cause. The Los Angeles County Department of Probation filed a return and the Public Defender's office filed a traverse. The traverse indicated that as of May 9, 2013, Jesus had been released and a continued hearing on competency was set for August 19, 2013.

We deny the petition for habeas corpus as moot but hold that a minor detained in Juvenile Hall pending attainment of competency must be provided with adequate services.

## FACTUAL & PROCEDURAL BACKGROUND

*Facts leading up to the wardship petition*

In 2011, Jesus was residing with his mother (Mother), his stepfather (Stepfather), two younger brothers and a four-year-old sister. He had been born in the United States but had been brought up in Mexico while his biological father remained in the U.S. In May 2011, Mother had recently moved back to the United States to live with Stepfather. Jesus was at school in December 2011 (then 13 years old) when he told school officials he was feeling depressed and wanted to kill himself. He had attempted to cut his wrist because of physical abuse by Stepfather. He was admitted to a psychiatric hospital. During interviews at the hospital, both Jesus and Mother disclosed that he had been

touching his brother Christian's genital areas. Christian (then 12 years old) was interviewed by detectives and told them that Jesus gave him $20 and told him not to tell Mother. Christian also told an officer that Jesus had grabbed him by the wrist, forced him against the wall, and placed his penis between Christian's legs until Jesus ejaculated. Jesus denied the allegations and said it was Christian who had touched him. Sibling Alejandro (then 10 years old), told the social worker that Jesus had come into his bathroom two times and tried to touch him on his penis, but Alejandro would not let him. Mother stated that she opened a bedroom door and observed Christian and Jesus lying on the bed, covered with a blanket. She lifted the blanket and observed that Christian's pants were down. Jesus told Mother to leave the room.

A wardship petition under Welfare and Institutions Code section 602 was filed on December 29, 2011, which alleged two counts of committing a forcible lewd act on a child (Pen. Code, § 288, subd. (b)(1)), and two counts of an attempted forcible lewd act upon a child (Pen. Code, §§ 664/288, subd. (a)). At the time the petition was filed, Jesus was one month shy of 14 years old. Jesus was taken into custody and placed in juvenile hall.

Jesus was arraigned on December 30, 2011. The Public Defender's Office was appointed to represent him.

Mother, who spoke Spanish only, told the probation officer in January 2012 that the whole incident was a misunderstanding as Jesus and Christian were just experimenting with their sexuality. She said once Jesus was returned home she would make arrangements so that Jesus would have his own bedroom and that she would sleep with the other children in the second bedroom, ensuring their safety. Mother denied she or stepfather physically disciplined Jesus. Mother told the probation officer she was illiterate "due to poverty" and had no family members in the country.

*The Protocol*

Welfare and Institutions Code section 709 provides: "During the pendency of any juvenile proceeding, the minor's counsel or the court may express a doubt as to the minor's competency. A minor is incompetent to proceed if he or she lacks sufficient

3

present ability to consult with counsel and assist in preparing his or her defense with a reasonable degree of rational understanding, or lacks a rational as well as factual understanding, of the nature of the charges or proceedings against him or her. If the court finds substantial evidence raises a doubt as to the minor's competency, the proceedings shall be suspended. . . . . The court shall appoint an expert to evaluate whether the minor suffers from a mental disorder, developmental disability, developmental immaturity, or other condition and, if so whether the condition or conditions impair the minor's competency. . . . (c) If the minor is found to be incompetent by a preponderance of the evidence, all proceedings shall remain suspended for a period of time that is no longer than reasonably necessary to determine whether there is a substantial probability that the minor will attain competency in the foreseeable future, or the court no longer retains jurisdiction. During this time, the court may make orders that it deems appropriate for services . . . that may assist the minor in attaining competency. . . ."

On January 9, 2012, the Presiding Judge of the Juvenile Division of the Superior Court of Los Angeles County issued a memorandum setting forth a protocol implementing Welfare and Institutions Code section 709 regarding juvenile competency to stand trial (the Protocol).

The Protocol provides in pertinent part, "If the court finds substantial evidence raises a doubt as to the minor's competency the court shall suspend proceedings. If the court suspends proceedings, or grants minor's request for a CST [competency to stand trial] evaluation, it shall appoint an expert from the Juvenile Competency to Stand Trial (JCST Panel) under Evidence Code § 730 to perform a CST evaluation. . . . If the court finds the minor competent, it shall reinstate the delinquency proceedings and proceed with the case." However, if the court finds the minor incompetent to stand trial (IST), "all proceedings shall remain suspended for a period of time that is no longer than reasonably necessary to determine whether there is a substantial probability that the minor will attain competency in the foreseeable future, or the court no longer retains jurisdiction."

4

The Protocol then outlines the procedures to be followed if the minor is detained. If the minor is detained the court shall set an IST planning hearing within 15 calendar days. The court shall then order the Probation Department (Probation) and the Department of Children and Family of Services (DCFS) to evaluate the minor and submit a planning report. If the court finds that "there is a substantial probability" that the minor will attain competency in the foreseeable future, the court shall order Probation and the Department of Mental Health (DMH) to begin "immediate coordination" of mental health and education services to help the minor attain competency. "Providing services to attain competency may include the coordination of services from DMH, Regional Center, education agencies and any other entity that has an obligation to provide services to the minor. To do this the court, or counsel, should consider joining such entities in the court proceeding . . . . If the minor has not been adjudged a ward or a dependent the court may issue subpoenas for persons, or agencies, who have an obligation to provide services to the minor. [¶] The case shall be set for an Attainment of Competency Hearing within sixty days. [¶] Pending attainment of competency, minor shall be held in the *least restrictive setting* and may only be detained if it is a matter *of immediate and urgent necessity for the protection of the minor or reasonably necessary for the protection of the person or property of another*. . . . The court shall review the appropriateness of minor's detention at every hearing after a finding of IST. [¶] . . . [¶] If the court finds that there is not a substantial probability that the minor will attain competency in the foreseeable future it shall dismiss the petition. . . . [¶] . . . [¶] At the Attainment Hearing[,] Probation shall submit a report that documents the specific services provided to the minor and, after consultation with the service provider, whether such services have been successful in helping minor to attain competency, and, if not, whether further efforts are likely to succeed. . . . [¶] If the court believes that minor has attained competency it shall reinstate juvenile proceedings. If the court finds that minor is not likely to attain competency in the foreseeable future, it shall dismiss the petition . . . . If the court finds that further efforts at attainment would be successful, it may order these services be provided for another period of sixty days. [¶] *The minor may not be held in a juvenile*

*hall to participate in attainment services for more than one hundred and twenty days.*"
(Italics added.)

*Competency Hearing*

On May 14, 2012, Jesus' counsel expressed a doubt as to his competence. Pursuant to the Protocol, the juvenile court suspended proceedings and appointed Dr. Timothy Collister to evaluate Jesus.

Dr. Collister performed a competency evaluation on May 30, 2012. His report stated, inter alia, that Jesus reported auditory and visual hallucinations and exhibited paranoia and suspicion. Jesus was cutting himself before hospitalization and had again attempted to cut himself while at Central Juvenile Hall. Mother was physically abused by his biological father and had a dysfunctional relationship with Stepfather. Jesus had auditory processing deficits, difficulty maintaining interpersonal relationships and acted inappropriately, with a general pervasive mood of unhappiness and depression. He had age-appropriate communication skills in Spanish but was not fluent in English. He had difficulty with attention and memory and deficits in verbal memory. It was Collister's opinion that Jesus was "not competent within the meaning of [Welfare and Institutions Code section] 709. He has an inadequate factual and rational understanding of the criminal proceedings against him, and will not be able to assist counsel in a rational manner. His incompetence flows primarily from a mental disorder." Dr. Collister felt it would be difficult for Jesus to rationally analyze courtroom procedures. He did not understand basic courtroom terms, or the roles of various participants in the court process, even after receiving training from Dr. Collister. Dr. Collister felt that as Jesus' psychiatric disturbance was treated, and as his status improved, it remained possible that he could be found competent but there was not a substantial probability that this would occur.

In an Addendum dated August 9, 2012, Dr. Collister stated that after administration of a test, 81 of 100 individuals in the Presumed Incompetent group would have a greater understanding of the criminal proceedings than Jesus does.

6

In August 2012, the juvenile court ordered a report to be prepared pursuant to Welfare and Institutions Code section 241.1.[1] The court also ordered Probation to prepare a plan for the minor in the event he was found to be incompetent.

On September 18, 2012, the court held a hearing on Jesus' competency. Dr. Collister testified, repeating his opinion that Jesus was not competent to stand trial, but this time he stated, "I think it's developmental immaturity more than a mental disorder. His processing with respect to memory is at the level of a six-year-old. And so the predominant reason for his incompetence is going to be the developmental immaturity. There is a mental disorder superimposed which probably can create difficulty as well, but I think the larger of his incompetence comes from his level of intellectual function."

Collister defined "developmental immaturity" as where the level of intellectual function is weak enough that it is the cause of incompetence. Jesus was "not retarded technically, but he's functioning at a very low level." Collister also stated, however, that developmental immaturity could sometimes improve with the passage of time, but age and training may or may not fix it. He stated Jesus had trouble with comprehension and memory and did not understand legal concepts even when Collister trained him. Jesus was confused about the role of the judge, and not necessarily because of a lack of education. Jesus was able to learn some information about the court process, retain it and then explain it to Dr. Collister, but it did not change Collister's opinion on his competency. His opinion did not change even though Jesus had admitted to the sexual touching and giving his brother money to keep silent. Collister reviewed education records which showed Jesus' verbal processing and receptive language in the borderline range and expressive language in the mild range of retardation. He explained: "For him

---

[1] This section provides that if a minor comes "within the description of both section 300 and Section 601 or 602 [of the Welfare and Institutions Code], the county probation department and the child welfare services department shall initially determine which status will serve the best interests of the minor and the protection of society. The recommendations of both departments shall be presented to the juvenile court . . . and the court shall determine which status is appropriate for the minor."

to understand the reality of what's transpiring and understand the process, what people are doing with him and what he needs to do in his own defense, thinking through rationally what he can do to assist counsel in his defense. I think those are going to be difficult things for him." Collister again said that "there's not a substantial probability that he would attain competency. . . . I don't think training is going to help him. It's pretty much a fixed neurologic thing at this point. It may improve in time based on his development."

The court found Jesus to be incompetent to stand trial. It then ordered Probation, DMH and DCFS to evaluate Jesus and to submit a planning report to the court on whether there are services available to help Jesus attain competency. The court included DCFS "because, although the minor isn't currently under the jurisdiction of [DCFS], if charges are dismissed and the minor is returned home, there are two minor children in that home who probably need to be removed since they are also alleged victims in this case."

The IST planning hearing could not be held within the required 15-day period required by the Protocol because the judge was unavailable. The IST hearing was scheduled for October 15, 2012.

On October 15, 2012, the probation officer's report was submitted. The probation officer had conflicting recommendations and did not have a placement available until 2013, so it requested a continuance for a further report. Jesus' counsel opposed a continuance, because the Protocol required a ruling on the issue of competency and because any further detention would be a violation of Jesus' constitutional rights. DCFS submitted a report concluding that Jesus should be returned to the home with intensive wraparound services. The "Wraparound Team" would include a youth specialist specifically assigned to Jesus, a parent partner assigned to support Mother and a facilitator assigned to the family. The Wraparound Team members would go to the house on a weekly basis or more frequently as needed to provide counseling. If an emergency arose precipitated by Jesus' behavior, the Mother would ensure that the siblings sleep in her bedroom.

8

The court stated, inter alia, "The report does address some issues. Probation indicates they believe the minor may be competent in the future. . . . I think the minor may be able to attain competency in the future with proper services. Probation still hasn't given us the proper services. I have issues with the public safety in that DCFS is recommending that the minor be placed in the home where both his victims are present. . . . I heard the testimony of the doctor. I don't have to endorse his testimony. . . . But I don't think it would be fair to the minor for me to make that determination now since we don't have all of the information."

Jesus' counsel requested the court to order Dr. Collister to appear at the next court hearing to testify, or in the alternative, to allocate more funds so Dr. Collister could evaluate Jesus and issue a further evaluation. The court denied the request and stated, "Again, we have two problems. Number one, this Protocol is so new that we don't even have services in place yet. One of the problems with the legislation was that they provide something we're supposed to do but no resources were allocated in order to attain competency. It looks like we may have those resources in place. I don't know yet because the report wasn't clear. That's why I need a further report. I'm not saying I made a decision yet. I'm saying I need more information."

On November 15, 2012, the juvenile court held the IST planning hearing. The court proposed joining in representatives of DMH, DCFS and Probation at the same time, but stated it did not have the resources to draft the joinder order and subpoenas. Jesus' counsel objected to his continued detention and indicated that it had been 58 days since he was found incompetent and that there had been no remediation efforts by Probation or DMH.

Everyone expressed concern for Jesus and concern that Mother could not protect the siblings. The court stated, "The problem, as I see it, is we have a Protocol set up without the resources to help the minor attain competency. This is just a real dangerous thing for me to do. . . . I could see the minor being placed back home with the two victims being removed from the home and one of the departments taking responsibility to provide competency training. I think we might be able to fashion a plan, even with the

9

limited resources we have. But again I'm going to suggest to both counsel we need to get all three agencies here at the same time and same place." The court declined to make a final ruling on whether the minor could attain competency. It denied the prosecutor's request to set an attainment of competency hearing and appoint a juvenile expert on the competency plan. Jesus' counsel offered to prepare the joinder subpoenas.

The court scheduled another planning hearing for December 14, 2012. Jesus' counsel renewed her objection to the detention.

At the December 14, 2012 hearing, the court had a two-hour off-the-record conference with representatives from DCFS, Probation, DMH and County Counsel. It then stated, "This is a brand new procedure. I've never done it before, and not many judges in the county have done it before. It's my view that under our Protocol the minor is entitled to be in the least-restrictive environment. It's also my view that the court has an obligation to balance the rights of the minor against public safety issues. . . . Before I return him to the home where the victims live, I want to initiate counseling services, obviously, to prevent another offense[]. And this concern is based upon the fact that the minor, while in the Hall, has engaged in what has been described as oppositional defiance disorders, that is opposition against authority, and he has acted out sexually. . . . It's my view that there is a danger of reoffense. . . . It may turn out Probation may develop services that may be appropriate to both treat the minor . . . and to bring him into competency, but those services will not be available for at least two months. . . . The wraparound team is going to explore with the Department of Mental Health [and] Probation . . . getting or keeping wraparound services or FSP in place. The Department of Mental Health, probation, and the wraparound team will explore getting sexual offender counseling in place . . . and DCFS is going to explore whether or not they're going to file a 300 petition should the minor be returned home. . . ."

Jesus' counsel then argued that Probation and DMH had provided no training and that Jesus had been incarcerated nearly a year. She argued there should have been an attainment of competency hearing in November 2012 and that he could not be detained after January 6, 2013.

10

The court denied the request and the matter was continued to December 28, 2012. A petition for writ of habeas corpus was filed on December 21, 2012. We denied the petition for writ of habeas corpus on January 9, 2013.

On January 28, 2013, Jesus' counsel filed a petition for review with the Supreme Court. Jesus remained detained and the matter was continued until February 28, 2013.

The Supreme Court granted review and ordered this court to issue an order to show cause why Jesus' prolonged detention without the provision of services was not in violation of the Protocol issued by the Juvenile Division of the Superior Court of Los Angeles County and did not otherwise deny Jesus due process of law. We issued an order to show cause on March 6, 2013.

Probation's return to the OSC contended that Jesus had been afforded due process and that it had not violated the Protocol because Jesus had been provided services to help him attain competency and that he had not been detained on an unreasonable basis for an unreasonable period of time. It argued that educational services and mental health services help attainment of competency, that Jesus received these services, and that nothing indicated that these services were not effective. It argued that the Protocol conflicts with Welfare and Institutions Code section 709 and is thus preempted. It requested judicial notice of the legislative history of Welfare and Institutions Code section 709 to demonstrate that a six-month maximum for suspension of proceedings had been considered and was rejected, resulting in statutory language that limited the suspension of proceedings to a period which is "no longer than reasonably necessary."

Jesus' counsel filed a traverse, which argued that Jesus had not received attainment of competency services while in juvenile hall and that Jesus was receiving educational services but not any other services. It also argued that Welfare and Institutions Code section 709 does not preempt the length of time that proceedings may be suspended, and not how long a minor may be detained in juvenile hall. Finally, it asserted that Jesus was deprived of equal protection and due process.

11

In the traverse, Jesus' counsel noted that Jesus had been released April 9, 2013, and the matter had been set for a competency hearing on August 19, 2013. It contended the petition was not moot because it concerns a current and ongoing problem.

*DISCUSSION*

*1. Is the Protocol Preempted by Welfare and Institutions Code section 709?*

In *Kalivas v. Barry Controls Corporation* (1996) 49 Cal.App.4th 1152, a courtroom established a rule that parties to a summary judgment motion must file a joint statement of disputed and undisputed facts. The rule was in conflict with Code of Civil Procedure section 437c, which required the parties to file separate statements, as well as with the promulgation requirements contained in the Code of Civil Procedure and the Government Code. The Court of Appeal held that trial judges have no authority to issue courtroom rules which conflict with statutes. (*Id.* at p. 1160.)

In *Hogoboom v. Superior Court* (1996) 51 Cal.App.4th 653 a "Family Law Mediation" fee imposed by the Los Angeles County Superior Court for family law and domestic violence matters was found to be preempted by the Family Code and the Government Code. (*Id.* at pp. 659-669.) The Court of Appeal reviewed other state statutes and concluded the Legislature had intended to determine the amount and type of fees imposed in conciliation court. (*Id.* at pp. 668-669.)

In *Los Angeles County Department of Children and Family Services v. Superior Court* (1996) 51 Cal.App.4th 1257, a local rule was enacted to appoint independent counsel for children in dependency proceedings. No other court rule or code section was inconsistent or conflicted with the rule in question. The Court of Appeal found that the dependency court did not abuse its discretion in issuing the rule and that there was no preemption by state legislation or statewide court rules. (*Id.* at p. 1267.) It held that the policy and rule were reasonable and a permissible exercise of the court's local rule-making power. (*Id.* at p. 1276.)

We conclude that the Protocol is most like the local rule enacted in *Los Angeles County Department of Children and Family Services v. Superior Court, supra,* 51 Cal.App.4th 1257. The Protocol mirrors much of the language contained in the Welfare

12

and Institutions Code but adds additional language which does not conflict with that statute. Welfare and Institutions Code section 709 does not contain a time limitation on the duration of competency services or how long a minor may be detained in juvenile hall. Section 709 only addresses the length of time proceedings may be suspended due to a finding of incompetency, that is, "no longer than is reasonably necessary to determine whether there is a substantial probability that the minor will attain competency in the foreseeable future or when the court no longer retains jurisdiction." (Welf. & Inst. Code, § 709, subd. (c).) The Protocol also contains the same language limiting the time for suspension of proceedings.

The Protocol's 120-day limitation on the detention period, therefore does not contradict or overrule Welfare and Institutions Code section 709, but adds additional rules for competency proceedings. There are no other code provisions which address these issues. Therefore we conclude the Protocol is not preempted.

     *2. Is the Protocol constitutional?*

In *Jackson v. Indiana* (1972) 406 U.S. 715, a 27-year-old who was described as a "mentally defective deaf mute" who could not read, write or otherwise communicate except through limited sign language was charged with two robberies. (*Id*. at p. 717.) The court appointed two psychiatrists to examine him. The two doctors submitted a joint report which concluded that he was unable to understand the nature of the charges against him or to participate in his defense. (*Id*. at p. 718.) One doctor testified that the defendant could probably never learn to read or write and that the sign language interpreter had not been able to communicate with him. The other doctor testified that even if defendant were not deaf and mute, he would be incompetent to stand trial. The sign language interpreter testified that the state had no facilities where the defendant could learn minimal communication skills. The defendant was ordered committed to the state department of mental health until it could certify that he was "sane." (*Id*. at p. 719.) The record did not establish that he was in need of custodial care. He was employed at times and no evidence that the care he received at home was inadequate. (*Id*. at p. 728.)

13

The Supreme Court held that the state's indefinite commitment based solely on his incompetency to stand trial was a violation of the defendant's constitutional rights to due process and that the indefinite commitment denied him equal protection because he was subjected to a more stringent standard of release than others charged with similar offenses. (*Id.* at pp. 729, 731.) It concluded that those who are "feeble minded" are eligible for release when their condition "justified it" or when they are "cured of such illness." (*Id.* at pp. 728-729.)

In *In re Davis* (1973) 8 Cal.3d 798 three persons were arrested, found to be "insane" and committed to state hospitals. (*Id.* at pp.802-803.) They each requested writs of habeas corpus to secure their release. None of them established that they were not competent to stand trial and none of them established that there was a likelihood that they would recover their competence. The California Supreme Court found they were all entitled, under *Jackson, supra,* 406 U.S. 715, to a prompt determination of their competence to stand trial. "[D]ue process demands that the duration of commitments to state hospitals must bear some reasonable relation to the purpose which originally justified the commitment. For example, in *In re Gary W.* [(1971)] 5 Cal.3d 296, 302-303, we noted that the chief purpose of a juvenile commitment to the Youth Authority under Welfare and Institutions Code sections 1800 et seq., is to provide treatment for the underlying cause of the ward's dangerousness, and that any person so committed who is not receiving treatment may seek his release through appropriate habeas corpus procedures." (*In re Davis, supra,* 8 Cal.3d at p. 805.)

The *Davis* court concluded, "If the report discloses that there exists no reasonable likelihood that the person will recover his competence to stand trial in the foreseeable future, then the court should either order him released from confinement or initiate appropriate alternative commitment proceedings . . . . The trial court necessarily must exercise sound discretion in deciding whether, in a particular case, sufficient progress is being made to justify continued commitment pending trial. To guide its discretion, the trial court should consider among other things, the nature of the offense charged, the likely penalty or range of punishment for the offense, and the length of time the person

14

has already been confined." (*In re Davis, supra,* 8 Cal 3d at p. 807.) The petitions for writs of habeas corpus were denied and the superintendents of the state hospitals were ordered to report without undue delay to the appropriate superior court regarding the progress achieved by the petitioners and their prognosis.

*Jackson* and *Davis* both involve adult defendants. We now consider whether they apply to minors in delinquency proceedings.

Minors in juvenile delinquency proceedings are entitled to due process rights. (*In re Gault* (1967) 387 U.S. 1, 31-57.) *James H. v. Superior Court* (1978) 77 Cal.App.3d 169 extended those rights to include a competency hearing in a delinquency proceeding. (*Id.* at pp. 174-175.) *James H.* fashioned a procedure for the court to follow if there was a reasonable doubt as to the minor's competency and advised the court to "borrow" from Penal Code section 1367,[2] or to follow the test enunciated in *Dusky v. U.S.* (1960) 362 U.S. 402, that is, whether the defendant has a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." (*Ibid.*)

*Timothy J. v. Superior Court* (2007) 150 Cal.App.4th 847 then addressed the differences between adult and minor brains and the ability to think logically and abstractly. (*Id.* at p. 860.) It concluded the younger a defendant is, the less likely he or she is to have the level of cognitive understanding to meet the *Dusky* standard. (*Id.* at pp. 860-861.) It reiterated the *Dusky* standard is used for determining incompetency and the inquiry is whether the minor is capable of understanding the proceedings and of cooperating with counsel. (*Id.* at p. 862.) It concluded that a juvenile may be found incompetent to stand trial solely because of developmental immaturity, without a finding of mental disorder or developmental disability.

---

[2] Penal Code section 1367 provides in pertinent part: "A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

The Protocol was an effort by the Los Angeles County Juvenile Courts to establish a procedure that implements Welfare and Institutions Code section 709. The Protocol also incorporates the procedures set forth in Welfare and Institutions Code section 709, *Timothy J., supra,* 150 Cal.App.4th 847 and California Rules of Court, rule 5.645.[3] The Protocol implements timelines which are designed to prevent against an indefinite commitment and to provide for release of minors who are not likely to recover competence. It also requires provision of services to attain competency. We conclude that the guidelines of the Protocol are in line with Constitutional requirements of due process as set forth in *Jackson* and *Davis* inasmuch as they address the problem of an indefinite commitment and the necessity of making a prognosis as to the likelihood of attaining competence.

    *3. Was the Protocol violated?*

        *a. Was the Protocol violated by keeping him detained?*

According to the Protocol, the court shall appoint an expert to evaluate the minor in order to determine his or her competency to stand trial. If the court finds the minor incompetent, it shall suspend proceedings, for a period of time "reasonably necessary to determine whether there is a substantial probability that the minor will attain competence in the foreseeable future."

---

[3]     Rule 5.645(d) provides in pertinent part that "If the court finds that there is substantial evidence that a child who is a subject of a petition filed under section 601 or 601 lacks sufficient present ability to consult with counsel and assist in preparing his or her defense with a reasonable degree of rational understanding, or lacks a rational as well as factual understanding of the nature of the charges or proceedings against him or her, the court must suspend the proceedings and conduct a hearing regarding the child's competence. Evidence is substantial if it raises a reasonable doubt about the child's competence to stand trial. [¶] (A) The court must appoint an expert to examine the child to evaluate whether the child suffers from a mental disorder, developmental disability, developmental immaturity, or other condition and, if so, whether the condition or conditions impair the child's competency. . . ."

Here, the delinquency proceedings were suspended on May 14, 2012. The court appointed an expert to evaluate Jesus as provided in the Protocol, held a hearing on Jesus' competency on September 18, 2012, and heard testimony from the expert.

The Protocol provides that if a minor is detained the court is to set an IST planning hearing within 15 days.

In this case, the 15-day deadline was not met because the courtroom was dark but an IST planning hearing was set soon after the deadline for October 15, 2012. At this hearing, the probation officer submitted a report with conflicting recommendations. Probation could not recommend a placement, so it requested a continuance. DCFS submitted a report proposing services once Jesus was returned home. The court felt Jesus might be able attain competency in the future but said it did not have enough information. It specifically did not make a decision as to whether Jesus could attain competency, and the IST planning hearing was continued until November 15, 2012.

The Protocol provides that at the IST planning hearing, the court is to order coordination between Probation and DMH. At the continued hearing on November 15th, the court proposed to join in the representatives of DMH, DCFS and Probation. The court declined to make a final ruling on whether the minor could attain competency, and scheduled another IST planning hearing for December 14, 2012.

The Protocol provides that, following a finding that there is a substantial probability that the minor will attain competency, the court is to set an attainment of competency hearing with 60 days. Here, on December 14th, the court again did not make a finding that the minor would attain competency. It found him incompetent but did not determine what was needed to attain competency, if at all. The matter was continued until December 28, 2012 for an attainment of competency hearing.

The record indicates that a January 29, 2013, "Pre trial Conference" hearing was continued until February 28, 2013, for a "competence PT" and that Jesus remained detained.

It appears that part of the court's reluctance to make a finding on whether Jesus could attain competency was due to the expert's equivocation on whether Jesus would

17

become easier to educate on court processes as he matured in age. Dr. Collister was not able to say with certainty that Jesus was or was not going to improve over time. In his May 30, 2012 evaluation, he stated that Jesus' incompetence flowed primarily from a mental disorder and that it was possible but not probable that he would attain competency as his psychiatric disturbance was treated and his status improved. In Collister's testimony on September 18th, he stated that the predominant reason for Jesus' incompetence was developmental immaturity, which could sometimes improve with the passage of time. He then said, "I don't think training is going to help him. It's pretty much a fixed neurologic thing at this point. It may improve in time based on his development."

Because of this testimony and because Probation and DMH could not make specific recommendations about what could be done to help Jesus, the court never made a finding that Jesus could attain competency. In addition, it never ordered specific attainment services.

Several of the Protocol's timelines were violated. The court did not set a timely IST planning hearing, did not order coordination of services between DMH, DCFS and Probation, did not make a finding on the probability that Jesus would attain competency, and did not order specific attainment services.

### b. Was the Protocol violated by the failure to provide services?

There was some dispute over what type of services were provided to Jesus.

The reporter's transcript of the October 15, 2012 hearing indicates that Jesus was going to school while in Juvenile Hall, but receiving no other services.

The November 15, 2012 probation officer's report indicated that DMH stated it did not have a placement that fit Jesus' needs and that there was no program which had been developed. At the November 15th hearing, both the deputy district attorney and counsel for Jesus stated that no remediation services had been provided. The matter was continued to subpoena representatives from DCFS, DMH and Probation.

In his December 14, 2012 report, the probation officer stated he was still attempting to have the regional center screen Jesus and have him assessed for educational

related mental health assessment services. There were setbacks in getting the authorization forms because Mother (who did not speak English) was told to fax the regional center intake forms back to the regional center. [4] Mother said she mailed them back in early November 2012 but the regional center had not received them as of December 13, 2012. The probation officer then told Mother to bring the forms to court. Mother said she had not received consent forms from the school psychologist at the juvenile center. Mother stated she had transportation issues. On December 13, 2012, the school psychologist faxed the consent form to the probation officer, who was going to have Mother sign the forms in court. The school psychologist said they would evaluate Jesus within 60 days and that the results of the evaluation should be available by February 2013.

The probation officer also reported that Juvenile Court mental health services did not have a placement that would fit Jesus' current needs. The committee appointed to develop a program for competency restoration was still in the planning stages and it was not anticipated that Jesus could enter a program until 2013.

On appeal, Probation argued that Jesus had been provided with educational and mental health services. A close review of the record, however, indicates that while he was initially provided with a mental health assessment and evaluation, he received no treatment on an ongoing basis which would have addressed his hallucinations, paranoia and suspicion, his depression and suicidal thoughts, or his understanding of sexually appropriate behavior. He was also receiving what appeared to be a general high school education, but nothing indicated that he was being educated about court processes and his legal rights or being taught how to communicate with his lawyer about these subjects, all of which were required under *Timothy J.*, *supra,* 150 Cal.App.4th 847.

---

[4]     Although Mother had stated she was illiterate, it is not clear from the record whether she was illiterate in both English and Spanish. The forms sent to her were in Spanish.

The Protocol sets forth deadlines about when a minor shall be adjudicated incompetent and how long he can be detained while receiving services, but does not set forth what type of services need to be provided to help the minor attain competency. It only provides that there must be "immediate coordination" of mental health and educational services.

While the court was clearly making its best efforts to bring in the various departments to coordinate the plan, as required by the Protocol, it was told repeatedly that no services were provided because no program was yet in place. We conclude that the Protocol was violated to the extent that it required immediate coordination of services and that services needed to be provided within a specific period of time. The court should have required Probation to specify services which it would provide to help Jesus attain competency and to initiate those services immediately despite the fact that no "program" was established.

*4. Was due process violated?*

After reaching the conclusion that the Protocol was violated both as to timelines for court hearings and orders and as to the length of Jesus' detention, we now discuss whether Jesus' due process rights were necessarily violated as well.

The Protocol complies with Constitutional requirements. As a result, a violation of the Protocol is presumptively a violation of Constitutional rights. However, that presumption is rebuttable based on the facts of a given case. In light of Jesus' release, and the subsequently scheduled hearing, we need not determine whether the circumstances of this case are sufficient to rebut the presumption.

*5. Conclusion*

In his petition for writ of habeas corpus, Jesus sought an order for immediate release. Since the traverse indicates that he was released, as of April 2013, the petition is effectively moot and we cannot grant habeas corpus relief. While we conclude that the juvenile court did not follow the Protocol because Jesus was detained too long in Juvenile Hall without proper services, we cannot grant the relief Jesus seeks and therefore do not reach the issue of whether his due process rights were violated.

20

*DISPOSITION*

Since Jesus has been released, we must dismiss the petition for writ of habeas corpus as moot.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                    **ZELON, J.**