Filed 11/10/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re ALBERT C., a Person Coming Under the Juvenile Court Law. | B256480 (Los Angeles County Super. Ct. No. MJ21492) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALBERT C.,<br><br>Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Denise McLaughlin-Bennett, Judge.  Affirmed as modified.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Theresa A. Patterson, Deputy Attorney General, for Plaintiff and Respondent.

_____

Proceedings against a minor on a juvenile delinquency petition (Welf. & Inst. Code, § 602)[1] must be suspended if the minor "lacks sufficient present ability to consult with counsel and assist in preparing his or her defense with a reasonable degree of rational understanding, or lacks a rational as well as factual understanding, of the nature of the charges or proceedings against him or her" based upon a showing that "the minor suffers from a mental disorder, developmental disability, developmental immaturity, or other condition . . . ." (§ 709, subds. (a) & (b).) Albert C., a minor named in two section 602 petitions, was detained in juvenile hall for 294 days[2] while receiving services to assist him in gaining competence after being declared incompetent to stand trial. At the end of that 294 day period, the delinquency court reinstated proceedings based on findings that minor was competent and he had "exaggerated" his inability to understand the nature of the proceedings.

Minor contends in this appeal that the delinquency court's handling of the proceedings after minor was declared incompetent violated various constitutional and statutory provisions, as well as a protocol drafted by the Presiding Judge of Juvenile Court in Los Angeles for the handling of cases in which a minor is declared incompetent. Minor also challenges conditions of probation imposed as part of a suitable placement order. We modify a condition of probation, but otherwise affirm.

## PROCEDURAL SUMMARY

On July 13, 2012, a section 602 petition was filed alleging that minor threatened a

---

[1] All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2] Minor was detained on the section 602 petitions for a total of 355 days. The period of 294 days is measured from the date of the competency planning hearing to the date minor was found competent, a period spanning from April 17, 2013, to February 4, 2014.

public officer, in violation of Penal Code section 71.[3] Minor denied the allegations at his arraignment hearing and was released into his mother's custody. On August 14, 2012, minor's mother reported that minor left home without permission, he had not returned for 48 hours, and his whereabouts were unknown. An arrest warrant was issued.

Minor remained at large until his arrest on February 12, 2013. A second section 602 petition was filed alleging the following: assault by means likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4) [count 1]); battery with serious bodily injury (Pen. Code, § 243, subd. (d) [count 2]); possession of a firearm by a minor (Pen. Code, § 29610 [count 3]); and criminal threats (Pen. Code, § 422, subd. (a) [count 4]).[4] At the arraignment on the second section 602 petition, minor's counsel declared a doubt as to minor's competence and proceedings were suspended.

Minor was detained in juvenile hall while proceedings were suspended. At a hearing on February 4, 2014, the delinquency court ruled minor had regained competency and reinstated proceedings.

On February 20, 2014, minor admitted count 1 of the first petition and count 1 of the second petition. He was ordered suitably placed. This timely appeal followed.

## DISCUSSION

*Constitutional Issues*

We first address the constitutional issues raised by minor. He contends (1) the juvenile court improperly reinstated delinquency proceedings by applying an incorrect legal standard and rejecting the opinion of the expert who evaluated minor and found him incompetent, (2) his right to due process of law was violated by his lengthy detention

---

[3] Minor was 14 years old at the time the petition was filed.

[4] Minor was 15 years old at the time the second petition was filed.

3

without evidence of progress toward competency, (3) the length of detention violated his right to equal protection of the law because he was not afforded the procedural protections required for a civil commitment, and (4) his right to confront and cross-examine witnesses was violated when the court considered statements by a deputy county counsel.

Minor's contentions are based upon the manner in which the delinquency court proceeded from the time minor's counsel declared a doubt as to minor's competency. We set forth a review of the proceedings in sections corresponding to the numerous arguments raised on appeal.

**The Section 602 Petitions, Detention, and Attempts to Place Minor**

The first section 602 petition was filed on July 13, 2012. The delinquency court explained deferred entry of judgment to minor at a pretrial hearing on August 8, 2012. Minor's counsel was unsure whether minor understood the proceedings. As a result, arraignment was continued to September 19, 2012, and minor was released home to his mother.[5]

An arrest warrant was issued after minor absconded from mother's home on August 14, 2012. Minor's whereabouts remained unknown until his arrest on February 12, 2013, which resulted in the filing of the second section 602 petition.

Arraignment on the second section 602 petition was scheduled for February 15, 2013. The lawyer standing for minor's counsel of record at the arraignment declared a doubt as to minor's competency to stand trial and proceedings were suspended. The

---

[5] According to the probation report filed on August 8, 2012, minor was a dependent child under section 300, and a joint assessment had been prepared pursuant to section 241.1 by the Probation Department (Probation) and the Los Angeles County Department of Children and Family Services (Department), with a recommended disposition of deferred entry of judgment (§ 790), with the Department as the lead agency. Recommended services included placement in the home, with minor to receive individual counseling, drug and alcohol testing, and education services.

delinquency court ordered minor detained upon finding that it was "a matter of immediate and urgent necessity for the protection of the minor and the person and property of others that the minor be detained. Continuance in the home is contrary to the minor's welfare; reasonable efforts have been made to prevent or eliminate the need for removal. There are no available services that would prevent the need for further detention." Similar findings supporting detention were made by the court at numerous proceedings until the ultimate resolution of the petitions.

The delinquency court made efforts to place minor in a less restrictive setting than juvenile hall, taking into account that minor was also a dependent child under section 300. Efforts to place minor were made difficult by his abysmal behavior in juvenile hall — "since the minor's last court appearance on 03/19/2013, the minor has been involved in 11 incidents while inside juvenile hall," and on March 20, 2013, "minor participated in gang activity when he flashed 'gang signs.'" Between April 10 and April 25, 2013, Probation filed three behavior reports with the court, detailing incidents involving minor.

On June 20, 2013, Probation filed a report discussing the least restrictive setting for minor's placement. The only available alternative to juvenile hall was to release minor to the Department's care and custody. The probation officer recommended that minor remain in juvenile hall due to his "past AWOL/runaway behaviors." When previously released to his mother's custody, minor left home without permission and his whereabouts were not known to Probation and the Department for six months. Minor was arrested on charges of assault by means likely to cause great bodily injury and criminal threats. Probation did not believe that the Department possessed the supervision and structure required to ensure minor's safety and the safety of the community based on his past delinquent history. Because minor was under dependency jurisdiction, the court could order the Department to screen minor for a "Level 14" facility. Probation recommended that the hearing be continued for one month to assess minor's progress. At the June 20, 2013 hearing, the court ordered the Department to screen minor for Level 14 placement.

A July 17, 2013 probation report stated that the a caseworker from the Department presented minor's case to the interagency screening committee on July 2, 2013. Minor met the criteria for a Level 14 treatment program and/or a community treatment facility. Service providers at the meeting stated that they would present minor's case to their respective agencies, but that at the time no beds were available.

At an August 15, 2013 hearing, the delinquency court clarified that it intended the Department and Probation to coordinate a Level 14 placement, and that it was in communication with the dependency court judge who would make a joint order. Minor's counsel renewed her objections to minor's detention and moved to dismiss all charges because of the court's failure to adhere to the Amended Competency to Stand Trial Protocol (Protocol) drafted by the Presiding Judge of Juvenile Court in Los Angeles and the constitutional requirements of due process of law. The court observed that the deadlines in the Protocol are "not law, it is protocol, and the court does believe that for reasons that have been stated there's good cause to deviate from protocol and has done so." The court denied the motion to dismiss and continued the competency hearings with findings supporting minor's continued detention.

At the hearing on August 26, 2013, the court stated that minor was eligible for and agreed to Level 14 placement, but that there was a four to six week wait before placement. On September 18, 2013, minor's counsel specifically requested minor be placed in the "Omega" housing unit of the Department. Minor's social worker stated that she had never heard of the "Omega" housing unit.

Probation's October 16, 2013 report advised the delinquency court that minor did not meet the criteria for admission into the Vista Del Mar facility. At a hearing on October 16, 2013, minor's counsel stated that at minor's last appearance in dependency court, a placement was open for minor that day but the dependency court failed to fund the placement and minor was not released. The delinquency court replied that the matter of funding would need to be resolved by the dependency court. Minor's counsel renewed her objection to minor's custody, arguing that minor was not likely to attain competency

6

in the foreseeable future and the petitions should be dismissed. Deputy County Counsel Paul Scolari advised the court that minor's next hearing in dependency court was set for October 28, 2013, and that he would argue that the section 300 "home of parent mother" order be changed so that minor be ordered into the custody of the Department. Minor's dependency attorney, Brian Thompson, stated that minor was on the waiting list for four different level 14 placement facilities, but that minor had been rejected at another facility, Harbor View, due to his gang affiliation.

### Proceedings on the Issues of Competency and Treatment

After minor's counsel declared a doubt as to minor's competency on February 15, 2013, the delinquency court appointed Dr. Praveen R. Kambam to evaluate minor for competency, and suspended proceedings as to both petitions. Dr. Kambam filed a report dated March 17, 2013, expressing the opinion that minor was incompetent to stand trial.[6] Dr. Kambam diagnosed minor with ADHD and Disruptive Behavior Disorder, but minor did not have any developmental disabilities. Dr. Kambam concluded: "It is my opinion, with reasonable medical certainty, that there is a substantial probability that the minor will attain Competency to Stand Trial in the next 12 months. While the minor is significantly impaired in his ability to retain information, reason, and make decisions, he has not had any medication trials with medications (such as ADHD medications) that improve executive functioning and reduce inattentive and hyperactivity-impulsivity symptoms. With mental health services to intervene in this area, and with repetitive education of competency-related concepts, he would likely significantly improve his understanding of these concepts."

---

[6] Dr. Kambam's report is not contained in the record on appeal, but is part of the record in a habeas corpus petition filed on behalf of minor in this court. We take judicial notice of the report, as it is a court record which is an essential component of minor's contentions on appeal. (Evid. Code, §§ 452, subd. (d)(1) & 459, subd. (a).)

In addition to Dr. Kambam's report, the delinquency court was already in possession of a report regarding minor's schooling and education. Minor entered special education in March 2007, under the eligibility of Attention Deficit and Hyperactivity Disorder (ADHD). According to an education report dated July 25, 2012, minor attained a "C" average in seventh grade but in eighth grade his average was "D-." In the first semester of ninth grade minor was failing three courses and close to failing a fourth class, but doing "significantly better in his reading and English classes." Minor had 53 period absences that semester. Minor failed all of his courses in the second semester of ninth grade, while accumulating 170 period absences. "Factors contributing to his lack of success [in school were] poor attendance and inappropriate behaviors." Cognitive testing on April 4, 2012, determined that minor possessed an average IQ. He did not meet the criteria for Specific Learning Disability, because although he had deficits in his academic skills, they were attributable to "significant life factors and lack of adequate exposure to school curriculum." Minor was eligible for special education under Emotional Disturbance, and under Other Health Impairment due to his ADHD.

The delinquency court found minor incompetent to stand trial at a competency hearing held on March 19, 2013. Probation and the Department of Mental Health (DMH) were ordered to evaluate minor and submit a report by April 10, 2013, with recommendations for treatment, and an assessment of whether minor was likely to gain competence in the foreseeable future. Minor remained detained.

Probation reported on April 10, 2013, that Probation and DMH were unable to collaborate on appropriate treatment or services for minor because there was no protocol or procedure for completing the report the court had ordered. Probation recommended minor's referral to the Regional Center for evaluation. The report also stated that according to minor's mother and maternal aunt, "minor has not been forthcoming with providing accurate information during his psychological assessments. Further, both mother and maternal aunt have advised this officer that they feel the minor may have been misleading the psychologists; so that his charges would be 'dropped.'"

8

The competency planning hearing was continued to April 17, 2013. Probation and DMH were again directed to evaluate minor and submit a joint report to the court with their recommendations for his treatment. Probation was ordered to prepare an Incompetent to Stand Trial planning report and refer minor to the Regional Center if appropriate. Minor remained detained, over the objection of his counsel, who argued that the least restrictive setting was in the home.

Probation filed a report on April 17, 2013, stating that minor would be referred to Creative Support US Services (Creative Support) for 20 hours of competency training, to occur once a week while minor was detained. Creative Support would administer an assessment test on its first visit, and submit a written report after training was completed. The probation report recommended that the hearing be continued to June 1, 2013, to assess the status of minor's competency attainment services. The court granted Probation's request to transfer minor from Sylmar Juvenile Hall to Central Juvenile Hall, because competency services could not be provided at Sylmar.

According to a probation report filed on May 23, 2013, the probation officer had been in contact with Nicco Gipson of Creative Support in regards to minor's competency training. Minor was to meet with Gipson weekly, for an hour and a half. Minor had completed two competency training sessions, but it was too soon to evaluate his progress. Probation recommended that the matter be continued for one month so that minor could continue with competency training.

At the May 23, 2013 hearing, minor's counsel renewed her objection to minor's detention on the basis that, under the Protocol, the case should be dismissed if minor could not attain competency within 60 days. Counsel argued that minor had not been placed in the least restrictive setting, and that the training he was receiving was ineffective. The court reviewed the history of the case and determined that it was reasonable for minor to be detained while receiving competency services for another month in light of public safety concerns. Probation was directed to provide a continued

9

assessment of whether minor could gain competency in the foreseeable future and if a less restrictive setting would be appropriate while he received training.

On June 20, 2013, Probation filed a report stating that Gipson planned to administer an assessment test to minor on June 19, 2013, to measure his progress. Gipson noted that minor had missed two training sessions, due to a dental appointment and a court appearance. Gipson would provide Probation with the test results. The June 20, 2013 hearing was continued for one month for receipt of Creative Support's report regarding minor's progress.

A report from Creative Support was attached to a July 17, 2013 probation report. It advised that minor commenced competency training services on May 9, 2013. Minor was tested on the first day of training, and again, on June 19, 2013. The Competency Assessment Instrument used to assess minor contained 14 domains, scored from 1 to 4, with 1 equaling clearly incompetent, 2 equaling borderline incompetent, 3 equaling borderline competent, and 4 equaling clearly competent. Minor scored a 1 in all 14 domains on both tests. According to the test standards he was incompetent to stand trial. Minor's counsel renewed her objection to minor remaining in custody, and requested the reappointment of the competency expert to evaluate whether minor was making progress towards attaining competency. The court denied the appointment motion as premature and ordered continuation of services and detention.

On August 15, 2013, Probation filed a report attaching a Creative Support report. Minor had been tested again on July 31, 2013, and received scores of 1 in all 14 domains of the Competency Assessment Instrument, meaning he was not competent to stand trial under the standard. Probation recommended continuing the hearing for two months to evaluate minor's progress.

Attached to a probation report filed on September 18, 2013, was a report from Creative Support which included scores from competency assessments administered to minor on July 31, 2013, and on September 11, 2013. On both tests, minor scored a 1 on a scale of 1 to 4 on each of the 14 domains, leading to a conclusion that minor was not

10

competent to stand trial. The probation report indicated that the Department had advised there were community-based vendors who provided competency training. However, minor was not currently a Regional Center client, and would need a referral to determine his eligibility.

At a hearing on September 18, 2013, the delinquency court stated that it had read the latest probation report, which appeared to be requesting a continuance of the matter, and requested that minor be referred to the Regional Center for a determination as to his eligibility for services. Deputy County Counsel Scolari, who appeared at the hearing, stated that minor's social worker had already made a referral to the Regional Center and that the evaluation assessment could take up to 90 days. Competency training could continue through the Regional Center, provided that minor met the criteria for the Regional Center.

Minor's counsel informed the court that she had filed a petition for writ of habeas corpus with this appellate court on September 10, 2013, seeking minor's release from custody, based on a violation of the Protocol. Minor's counsel represented that after at least four tests, minor was still scoring all 1's, which demonstrated that he was not progressing. Counsel argued that minor was clearly incompetent, and that his continued detention was illegal. She requested that the section 602 petitions be dismissed, based on a finding that minor was not substantially likely to obtain competency in the future.

The prosecutor argued against minor's release and against the dismissal of the petitions, noting that minor was facing serious charges, and that it appeared the Department agreed that a level 14 placement was best for minor and the public. Minor's counsel responded that detention in juvenile hall was not safe for minor, and requested he be placed in the least restrictive placement while receiving competency training.

The delinquency court summarized in detail the proceedings up to that point, and continued the matter for another hearing on October 16, 2013. The court noted that it was still within the 12-month period for attaining competency that was referenced in Dr. Kambam's original report. The continuance request was reasonable, as minor was

11

continuing to receive competency training. The court ordered Probation to provide information at that time as to the status of minor's evaluation by the Regional Center, as well as progress towards transferring minor to a closed level 14 placement.

On October 16, 2013, Probation filed a report advising minor was tested by Creative Support on October 2, 2013, and scored all 1's in each of the 14 domains, leading to the conclusion that he was not competent to stand trial. At a hearing on October 16, 2013, the delinquency court expressed concern that the report from Creative Support contained essentially the same information as the previous month's report, and that the progress reports did not contain any description of the training being provided, or information that the testing was capable of preventing malingering. The court was inclined to appoint an expert to evaluate minor's competency. The prosecutor agreed with this suggestion, noting her concern that minor was "malingering and may in fact actually be competent and completely aware of what's going on." Minor's counsel stated that minor continued to receive failing test scores on his competency assessments, showing that there had been no progress toward attainment of competency. The delinquency court suggested that the author of the Creative Support report, Amy Wilcox, be ordered to appear at the next hearing to answer questions about the tests and services being provided to minor. Minor's counsel renewed her objection to minor's custody, arguing that minor was not likely to attain competency in the foreseeable future and the petitions should be dismissed. Counsel also renewed her request to have Dr. Kambam appointed to reevaluate minor. The delinquency court denied the request to have Dr. Kambam reappointed, choosing instead to appoint the next expert on the list to evaluate minor. The court ordered Wilcox from Creative Support Services to appear at the next hearing on November 12, 2013.

**Testimony and Reports Leading to the Court's Determination that Minor was Competent**

At the hearing on November 12, 2013, Wilcox, who scored minor's tests for Creative Support, produced minor's most recent test, showing that he answered, "I don't know" to every question, which was the basis for his scores of 1. Wilcox verified that the Competency Assessment Instrument could not control for malingering. All Creative Support could do was "give the test, provide the training; and that would be the forensic psychiatrist that would determine that if there were any malingering."

Dr. Cory Knapke filed a report after evaluating minor, concluding that minor was incompetent to stand trial, basing the finding on minor's lack of maturity and understanding of courtroom proceedings. The prosecutor expressed concern that minor was malingering, and the matter was set for an attainment of competency hearing. An attainment of competency hearing was held on February 4, 2014. Competency trainer Gipson and Dr. Knapke testified.

Gipson worked as a competency trainer for Creative Support with seven years of experience. She trained minor for about eight months in weekly sessions of an hour and a half, following a competency manual, which contained 14 different domains of competency material. She and minor went over the materials in the manual and discussed the information, then administered mini-tests to assess minor's understanding. His performance on the tests varied. He would appear to understand the information during one session, but the next week he might forget and they would need to review. Competency was scored on a scale of 1-4, with 1 being the lowest score. A 3 or 4 in all domains was a passing score. Gipson knew minor had scored more than a 1 at some point but could not recall when, or how often. Minor had attained a passing score on some domains, but then later failed the same domains. Gipson believed that minor may have scored as high as a 4 in some domains, but she could not be absolutely certain. Minor was able to respond to questions and appeared to understand the conversation.

13

Gipson spoke to minor about topics unrelated to competency training. She had no issues communicating with minor, who was friendly and usually calm.

The court questioned Gipson regarding minor's test scores that had been provided to the court on November 12, 2013, which showed scores of 1 in all domains, and in which minor uniformly answered "I don't know" to questions. Gipson testified that minor had been tested since then in early January, although the test had not been officially scored. She had the test with her. The test result was admitted into evidence without objection. Gipson testified that minor was able to answer many more questions now than in the past and was making good progress. The court asked if minor would receive a better score on the current test. Gipson replied, "Where you see the pluses on here it's just as I went through the plus means that he will get a three or better, which means that it would be a pass on that particular question." When asked by minor's counsel, Gipson confirmed that minor would have to pass all 14 domains to be considered competent, and that he did not pass all 14 domains on the January test.

Dr. Knapke evaluated minor in November 2013, three months before he testified at the hearing. He determined that minor was not mentally retarded or developmentally disabled, and minor did not suffer from hallucinations or delusions. Minor did not exhibit any signs of ADHD. Minor was not entirely truthful during the interview, specifically with regard to frequency of drug and alcohol use, gang affiliation, and weapons possession.

Dr. Knapke determined that minor was able to rationally cooperate with his attorney, but he was concerned about minor's understanding of basic courtroom proceedings based on minor's poor school performance and grades. He elaborated: "As a result other psychologists and psychiatrists have also evaluated him and felt that he had problems with his thinking with his ability to reiterate basic courtroom proceedings when asked about courtroom proceedings, and during my examination when I asked him similar questions he responded I don't know to everything. He was unable to give me the names of any pleas. He was unable to differentiate between the adversarial roles of the

14

district attorney verses [*sic*] a public defender. He was unable to explain what a judge does in the courtroom. He was unable to basically explain anything about courtroom proceedings, and because of his lack of education primarily due to his disruptive behaviors in the past, in other words being truant from school, being constantly absent from classes, being extremely disruptive in his classrooms and being aggressive in his classroom settings, he was unable to learn appropriately and his academic skills and understanding completely fell behind his peers. However, his IQ has been determined to be normal. So in my opinion his lack of understanding of courtroom proceedings and his lack of individual skills, if you will, is not due to lack of potential; in other words, he's not developmentally disabled but rather his problems with understanding, his lack of effort, and behavioral problems that have resulted in his inability to learn basic concepts."

Dr. Knapke could not rule out the possibility that minor was exaggerating his lack of understanding of courtroom proceedings. He would expect a juvenile of minor's intelligence level to have attained competency or have been able to demonstrate a basic understanding of courtroom proceedings after eight to nine months of competency training. When asked if minor "should have attained competency by now," Dr. Knapke said, "Yes. He's not mentally retarded. He—he has normal intelligence. There's no psychiatric reason from my point of view that he is unable to learn basic courtroom proceedings, especially after eight months of competency training." Dr. Knapke considered eight months of competency training to be "a lot of competency training."

When Dr. Knapke asked minor why he was in custody, minor avoided the question and spoke about abuse issues with his mother and grandmother. This was one of the reasons leading Dr. Knapke to opine at the time of his examination that minor was incompetent to stand trial, since minor was unable to state what he was charged with or to provide any information about courtroom proceedings. Minor seemed unsophisticated and "child-like" during the interview, but Dr. Knapke could not rule out the possibility that he was exaggerating his lack of understanding of basic concepts, including spelling and other questions addressing cognitive functions.

During cross-examination by minor's counsel, Dr. Knapke testified that ". . . I've been observing your client through the—through the day today, he's been appropriate in terms of courtroom, of—in terms of his courtroom demeanor he's been whispering to you as he's been listening to witnesses, listening attentively to witnesses. So he's been assisting you with—with his defense . . . ."

Minor's counsel asked Dr. Knapke if he discussed possible scenarios involving plea bargains. Dr. Knapke responded, "No, because once I began asking him about courtroom proceedings his response to almost every single question was I don't know. It was clear to me that he was not going to explain in any detail whatsoever any further information about courtroom proceedings. And keep in mind I was sufficiently concerned about his lack of understanding of courtroom proceedings at the time of my evaluation to opine in my report that I did not believe that he was competent, and I believed it was reasonable at that point in time that he continue with competency training. However, it was only based on his lack of understanding of courtroom proceedings, or at least that was my objective observations, I could not rule out the possibility, however, that he might have been exaggerating some lack of understanding regarding that."

Dr. Knapke went on to testify that, "Based on what I heard today from the Creative Support person I think that there is a very high likelihood that he not only can attain competency, but I think it's pretty probably likely that he does understand basic courtroom proceedings." In order to provide a "very definitive" opinion as to minor's present competency, he would need to reexamine minor. He noted "that there is substantial likelihood that he indeed has a basic understanding of courtroom proceedings at this point."

The delinquency court made a detailed ruling on the record:

"In considering the information that the court has received thus far, particularly there being no evidence of any mental retardation, no evidence of any developmental disability, no evidence of mental illness, evidence that the minor possessing [*sic*] a normal IQ, that he has the probability of understanding, and it appears that if there has

16

been any expressed misunderstanding it's been due to lack of effort or those behaviors that have been exhibited by the minor that have been described both in Dr. Cambam's [*sic*] report as well as Dr. Knapke's report. And in considering those responses contained within the January 30, 2014, revised competency assessment instrument, which I think the record should reflect is the same test that was presented by Ms. Wilcox back in November where all of the responses were I don't know. I think it should also be stated for the record that the reason why Ms. Wilcox came into the court with the same test with the repetitive responses of I don't know was because of the court's concern of receiving prior to November 2013 multiple reports from Creative Solutions [*sic*] indicating that the minor had scored all ones and because of that was incompetent. The court did not have information at that time as to what the scoring was based upon, nor did the court have any information with respect to the type of training probation had provided to the minor pursuant to the order the court made back in March of 2013. Ms. Wilcox did provide that information pursuant to the court's request by showing the court a copy of the questionnaire which has now been marked as People's 1, not the exact one questionnaire that Ms. Wilcox presented in November of 2013, but the same test format. The explanation at that time from Probation was that the minor had answered every question at that time with the response I don't know, and because of that that's why reports have been submitted to the court that there was a consistent finding that the minor had not yet attained competency, had remained incompetent, and required further training. It was also at that time that the People raised concern based on information it had about malingering issues, and because of that Dr. Knapke was appointed to determine whether or not the issue of competency was still at issue and whether or not the minor was malingering, and I don't believe that Dr. Knapke ever used the word malingering. I believe that Dr. Knapke's word was exaggerated, that's how he referenced it in the report that he prepared, and that's what—that's what he testified to that he could not rule out the minor exaggerating his responses in order to delay these proceedings.

"Seeing no evidence in this court's mind that would explain why the court—why the minor would repetitively state I don't know to questions that it would appear to this court could be answered by the minor, particularly since there's no evidence of mental retardation, there's no evidence of developmental disability, there's no evidence of mental illness, I do agree with Dr. Knapke that there's no reason why this minor has not yet attained competency. I did observe the minor during these proceedings and note that while I certainly could not hear what the minor was saying to his attorney, there was [*sic*] several times when he did attempt to get his attorney's attention and did converse with his attorney. He seemed to be engaged in hearing, he was not distracted, his facial gestures appeared to respond within reason to some of the testimony that was given both by Ms. Gipson and by Dr. Knapke. When I take all of this evidence into consideration I find that there is overwhelming evidence to suggest that the minor has been exaggerating his responses, and that's the only reason why he's failed to give an accurate and forthright response to some of the questions that are contained within the questionnaire.

"I find that the People have met their burden, I find that the minor has attained competency and proceedings will be reinstated effective today."[7]

***Standard of Review and Legal Principles Relating to Competency***

The federal and state constitutional rights to due process prohibit persons who are incompetent to stand trial to be subjected to a criminal trial or a juvenile delinquency proceeding. (*In re Christopher F.* (2011) 194 Cal.App.4th 462, 468, disapproved on other grounds in *R.V., supra,* 61 Cal.4th at p. 199.) Pursuant to section 709, subdivision (a), a minor is incompetent "if he or she lacks sufficient present ability to consult with counsel and assist in preparing his or her defense with a reasonable degree of rational

[7] The court's ruling was made prior to our Supreme Court's decision holding that a minor claiming incompetency has the burden of proof. (*In re R.V.* (2015) 61 Cal.4th 181, 193 (*R.V.*).)

18

understanding, or lacks a rational as well as factual understanding, of the nature of the charges or proceedings against him or her." The language in section 709 is consistent with the standard adopted in *Dusky v. United States* (1960) 362 U.S. 402, 402 (*Dusky*). (See *R.V.*, *supra*, at p. 188, quoting *Dusky, supra,* at p. 402 ["the inquiry into a defendant's competency . . . focuses on whether the defendant '"has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and . . . a rational as well as factual understanding of the proceedings against him"'"].)

Although adults may be declared incompetent on the basis of mental disorder or developmental disability only, juvenile incompetence also encompasses developmental immaturity, in light of the fact that minors' brains are still developing. (*Timothy J. v. Superior Court* (2007) 150 Cal.App.4th 847, 860-862.) "Thus, unlike an adult, a minor does not need to show that his or her inability to understand or assist arises 'as a result of mental disorder or developmental disability.'" (*Bryan E. v. Superior Court* (2014) 231 Cal.App.4th 385, 391 (*Bryan E.*), citing *In re John Z.* (2014) 223 Cal.App.4th 1046, 1053.)

Our Supreme Court has recently interpreted section 709 to include a presumption of competency, and the party claiming incompetency bears the burden of proof by a preponderance of the evidence. (*R.V.*, *supra*, 61 Cal.4th at p. 193.) In reviewing a finding of competency, we view the record in the light most favorable to the verdict and uphold the verdict if it is supported by substantial evidence. (*Id.* at pp. 198-200.) "A juvenile court's determination regarding competency . . . involve[s] an 'individual-specific decision' that is 'unlikely to have precedential value.' [Citation.] Guided by the . . . well-settled legal definition of competency, . . . the juvenile court . . . draw[s] [its] conclusions based on an appraisal of the particular expert testimony by mental health professionals, courtroom observations, and other testimonial and documentary evidence then before the court in the case." (*Id.* at pp. 199-200.) "[A] juvenile court's determination regarding competency, even if made in the absence of an evidentiary

19

hearing, may be informed by the court's own observations of the minor's conduct in the courtroom generally, a vantage point deserving of deference on appeal." (*Id*. at p. 199.)

"Even if the prosecution presents no evidence of competency, a juvenile court can properly determine that the minor is competent by reasonably rejecting the expert's opinion. This court has long observed that '"[t]he chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion."' [Citation.] In a case such as this one, therefore, the inquiry on appeal is whether the weight and character of the evidence of incompetency was such that the juvenile court could not reasonably reject it. [Citation.]" (*R.V.*, *supra*, 61 Cal.4th at pp. 200-201.)

*Compliance with the Standards of Incompetence to Stand Trial*

Minor argues the ruling of the delinquency court that minor attained competency to stand trial was improper for three reasons. First, he argues the court erred in finding competency despite the report of Dr. Knapke that minor did not understand the nature of the proceedings. Second, he contends the court did not comply with the standard required by *Dusky*, *supra*, 362 U.S. 402. Third, he argues the court held him to the standard of competence applicable to adults, rather than the broader standard applied to juveniles. We disagree with minor's contentions.

**Asserted Rejection of Dr. Knapke's Conclusions**

We reject the argument that the court erred in finding minor competent after Dr. Knapke expressed contrary opinions in his written report and in his testimony. Minor overstates the situation. Dr. Knapke's written report was prepared approximately three months before the hearing, at a time when he did not know that minor had given rote

answers of "I don't know" to Gipson's questions on courtroom procedures, despite minor having received months of training. Although Dr. Knapke opined initially that minor was incompetent because he did not understand the nature of the proceedings, by the end of the hearing he had concluded there was a "substantial likelihood" that minor had a basic understanding of courtroom proceedings. A review of the entire record reveals that the court did not entirely reject the opinions expressed by Dr. Knapke; to the contrary, the court accepted his finding on minor's lack of mental disease, the opinion that minor should have progressed toward competence with over eight months of training, and the doctor's current belief based on his in-court observations that minor was capable of understanding the nature of the proceedings.

As our Supreme Court has made clear, a trial court is not bound by an expert opinion that a minor is incompetent to stand trial. (*R.V.*, *supra*, 61 Cal.4th at pp. 200-201.) The delinquency court considered the basis for the expert's opinion, which in this case was undermined by the observations by both the doctor and the court of minor participating competently in court. The trial court could reasonably reject Dr. Knapke's opinion on incompetence based on "the weight and character of the evidence of incompetency." (*R.V.*, *supra*, at p. 203.) Based on the totality of the evidence before the court, the court fairly concluded there was overwhelming evidence that minor "exaggerated" his answers to his own benefit—a polite way of stating he was feigning incompetence, just as minor's mother and grandmother had suggested early in the proceedings.

**Compliance with the *Dusky* Standard**

The inquiry under *Dusky* focuses on two elements: (1) the present ability to consult with a lawyer with a reasonable degree of rational understanding; and (2) a rational and factual understanding of the proceedings against him. (*Dusky*, *supra*, 362 U.S. at p. 402; *R.V.*, *supra*, 61 Cal.4th at p. 188.) The first *Dusky* element is not in issue,

21

as Dr. Knapke's testimony that minor was able to rationally cooperate with counsel constitutes substantial evidence.

The remaining issue is the second prong of competency—whether minor understood the nature of the proceedings. Our review of the delinquency court's thorough and thoughtful analysis demonstrates that the court correctly applied the *Dusky* standard.

The delinquency court noted in her ruling that there was no evidence to explain why minor would repeatedly state, "I don't know" to questions regarding courtroom procedures, "particularly since there's no evidence of mental retardation, there's no evidence of developmental disability, there's no evidence of mental illness . . . ." The court accepted Dr. Knapke's testimony that there was no reason why this minor has not yet attained competency.

Most importantly on this issue, both the court and Dr. Knapke observed that minor was engaged in the proceedings, and there is no hint in the record that he did not understand what was taking place at the attainment of competency hearing. The court pointed out that minor several times during the hearing attempted to get the attention of his counsel and conversed with his attorney. The court described minor as "engaged" and pointed out that he was not distracted and made facial gestures that appeared to respond within reason to portions of the testimony by Gipson and Dr. Knapke.

In the end, the court concluded, "[T]here is overwhelming evidence to suggest that the minor has been exaggerating his responses, and that's the only reason why he's failed to give an accurate and forthright response to some of the questions that are contained within the questionnaire." In other words, the court concluded that minor, with an average IQ and no mental disease or defect, did understand courtroom procedures and had feigned incompetence to manipulate the system to his own benefit. (See *R.V.*, *supra*, 61 Cal.4th at p. 199 [juvenile court may rely on its own observations in finding competency, even in the absence of an evidentiary hearing].) The court's conclusion is consistent with Dr. Knapke's testimony that, after hearing the testimony from Gipson, "I

22

think that there is a very high likelihood that he not only can attain competency, but I think it's pretty probably likely that he does understand basic courtroom proceedings," and "that there is substantial likelihood that he indeed has a basic understanding of courtroom proceedings at this point."

### Misapplication of the Adult Standard of Competence

Minor contends that the court held him to an adult competency standard, disregarding his developmental immaturity as a legal cause of incompetence. He primarily relies on the court's statements that minor had no mental disorder or developmental disability that would prevent him from attaining competency. His interpretation of the court's statement is too limited. Mental disorder and developmental disability are two of the bases for juvenile incompetency. The court understandably ruled out these bases as part of its decision. The court did not stop there, however, or state that those were the only bases for minor's incompetency. The court noted evidence that minor possessed "a normal IQ, that he has the probability of understanding," and observed that "[minor] seemed to be engaged in hearing, he was not distracted, his facial gestures appeared to respond within reason to some of the testimony that was given . . . ." The court concluded that "[s]eeing no evidence in this court's mind that would explain why . . . the minor would repetitively state I don't know to questions that it would appear to this court could be answered by the minor . . . I do agree with Dr. Knapke that there's no reason why this minor has not yet attained competency." The court did not limit the possible causes of incompetency to mental disorder and developmental disability. The court applied the correct standard for assessing juvenile competency to determine that minor possessed the necessary mental ability to stand trial.

*Due Process Violation Based on Prolonged Detention*

Minor contends that his detention for 294 days while receiving services to attain competency violated his right to due process of law. His due process claim has two elements. First, minor argues the length of his detention did not comply with the standards for due process set forth by the United States Supreme Court in *Jackson v. Indiana* (1972) 406 U.S. 715, 738-739 (*Jackson*) and the California Supreme Court in *In re Davis* (1973) 8 Cal.3d 798, 801 (*Davis*). Second, he argues that detention beyond 120 days presumptively violated due process based on the Protocol issued by the Presiding Judge of the Juvenile Court in Los Angeles. (See *In re Jesus G.* (2013) 218 Cal.App.4th 157 (*Jesus G.*).) Both arguments fail.

### Compliance with *Jackson* and *Davis*

The defendant in *Jackson* was "a mentally defective deaf mute with a mental level of a pre-school child" who was charged with two robberies, involving items totaling $5 or less in value. (*Jackson*, *supra*, 406 U.S. at p. 717.) Two psychiatrists opined that Jackson was incompetent to stand trial and there was an extremely low possibility of Jackson regaining competency. One psychiatrist stated that it was unlikely Jackson could learn to read or write, and questioned whether he was even able to communicate with the interpreter in sign language. The other stated that Jackson would be incompetent even if he were not deaf and mute. (*Id*. at pp. 718-719.) He was held in a state mental facility pending a determination as to whether he was "sane." (*Id*. at p. 719.) The State of Indiana did not have facilities that could assist Jackson in attaining competence and there was no evidence that Jackson could not receive adequate care at home or that he otherwise required custodial care. (*Id*. at p. 728.) Indiana law did not provide for periodic review of the defendant's condition by the court or mental health authorities, nor

did it accord the defendant any right to counsel at the competency hearing. (*Id.* at pp. 720-721.)

The Supreme Court held that "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal." (*Jackson*, *supra*, 406 U.S. at p. 738, fn. omitted.) The Supreme Court declined to quantify a reasonable period of time, "[i]n light of differing state facilities and procedures and a lack of evidence in this record, we do not think it appropriate for us to attempt to prescribe arbitrary time limits." (*Ibid*.) It noted that "Jackson [had] been confined for three and one-half years on a record that sufficiently establishe[d] the lack of a substantial probability that he w[ould] ever be able to participate fully in a trial." (*Id*. at pp. 738-739.)

In *Davis*, three accused misdemeanants were found incompetent to stand trial. (*Davis*, *supra*, 8 Cal.3d at pp. 802-803.) They petitioned for habeas corpus relief after they had been held in a state hospital for several months without a determination as to whether they were likely to regain their competence. (*Id*. at p. 806.) The *Davis* court complied with the rule in *Jackson* by holding that "no person charged with a criminal offense and committed to a state hospital solely on account of his incapacity to proceed to trial may be so confined more than a reasonable period of time necessary to determine whether there is a substantial likelihood that he will recover that capacity in the foreseeable future. Unless such a showing of probable recovery is made within this period, defendant must either be released or recommitted under alternative commitment procedures." (*Id*. at p. 801.)

25

The *Davis* court stated that "[w]ith respect to future commitments, we think that in order to comply with *Jackson*'s demands the trial courts should henceforth direct the appropriate state hospital authorities to commence an immediate examination of the person committed and, within a reasonable time, report to the court the result of that examination and estimate the additional time probably necessary to restore the person to competence. Should the person committed desire to challenge the report's conclusions, reasonable opportunity should be provided him to do so." (*Davis, supra,* 8 Cal.3d at p. 806, fns. omitted.) The three *Davis* petitioners had neither established that they were competent to stand trial nor that they were likely to be, and there was nothing in the record to support the conclusion that they were unlikely to respond to treatment. (*Ibid.*) Instead of ordering the petitioners released, the *Davis* court ordered hospital authorities to report without delay on whether petitioners were likely to attain competency in the foreseeable future. (*Ibid.*)

Minor has not established a due process violation under *Jackson* and *Davis*. Unlike the defendant in *Jackson*, who suffered from multiple disabilities and was unlikely to ever attain competence, minor's incompetence was founded on emotional immaturity, which according to Dr. Kambam, could be remedied within 12 months. In this respect, minor's circumstances are in no way comparable to the defendant in *Jackson*, considering that Dr. Kambam expressed the opinion that minor had no mental illness, disease, or developmental disability. Minor had no insurmountable mental issues, he had an average IQ, had passing grades when he attended school on a regular basis, and incompetence was based on emotional immaturity. Under these circumstances, we hold that 12 months to attain competency was constitutionally reasonable.

It bears emphasis that minor was assisted by counsel throughout the proceedings. The delinquency and dependency courts worked together to place minor outside of juvenile hall in a less restrictive facility, but were unsuccessful due to minor's level of criminality and antisocial behavior as reflected in his numerous rule violations. Again, these circumstances are not in any way comparable to what occurred in *Jackson*.

26

In compliance with *Davis*, once minor was declared incompetent, the delinquency court ordered services to assist minor in attaining competence. The court monitored the services and minor's progress on a regular basis with reports. Creative Support essentially reported raw data; minor's answers to the questions presented were accepted without consideration of whether he was making an honest effort or malingering. Because the nature of the reports did not assist the court in determining whether minor was making progress, or if not, what was causing the delay, the court appointed Dr. Knapke to update minor's progress and current status, and scheduled a hearing to complete the record. As it turned out, the reason minor remained detained for 294 days while receiving services was minor's manipulation of the system. The circumstances of this case do not amount to a due process violation. The length of detention in this case was the product of minor's determination to avoid a finding of competency, as evidenced by his repeated answer of "I don't know" to basic questions despite months of training, an average IQ, and no mental disease or defect.

**Violation of the Protocol**

Minor argues that his detention in juvenile hall beyond 120 days violated due process based on the Protocol, as interpreted in *Jesus G., supra,* 218 Cal.App.4th 157. We reject the arguments for three reasons. First, the 120-day limit on detention in the Protocol lacks the force of law and it therefore does not define due process. Second, to the extent the Protocol purports to fix the maximum period of confinement at 120 days while proceedings are suspended, it conflicts with the holding in *Jackson* and section 709, both of which provide for a reasonable period of time, not a fixed number of days, to attain competence. Third, assuming there was a violation of the Protocol or section 709, the error is harmless because, as we have already concluded, the trial court provided minor with services to attain competency and the court's ultimate conclusion that minor was competent is supported by substantial evidence.

27

The Protocol was drafted by the Presiding Judge of the Juvenile Court in Los Angeles. It sets forth a timeline for processing cases in which proceedings are suspended because of a minor's incompetence to stand trial, including the following: "'*The minor may not be held in a juvenile hall to participate in attainment services for more than one hundred and twenty days.*'" (*Jesus G., supra,* 218 Cal.App.4th at p. 162.) The *Jesus G.* court stated that the guidelines in the Protocol "are in line with the constitutional requirements of due process as set forth in *Jackson* and *Davis* inasmuch as they address the problem of an indefinite commitment and the necessity of making a prognosis as to the likelihood of attaining competence." (*Id*. at p. 171.) Without further discussion or explanation, the court concluded that "[t]he Protocol complies with constitutional requirements. As a result, a violation of the Protocol is presumptively a violation of constitutional rights." (*Id*. at p. 174.) Minor relies on this final statement to support his argument that the court violated his due process rights by deviating from deadlines prescribed in the Protocol.

We hold that the Protocol is not entitled to the force of law, and the 120-day limit on detention does not define due process. The delinquency court in this case properly observed that the Protocol "is not law," it is a set of guidelines, which a judge is free to consider in his or her discretion. The Protocol is certainly a thoughtful and articulate memorandum relating to the processing of delinquency cases involving competency issues, but it is not a local rule of court and was not issued pursuant to a legislative directive. (Compare § 241.1, subd. (e) [expressly directing the creation of a protocol by the juvenile court for dual jurisdiction delinquency/dependency minors].)

A single judge, even a presiding judge, cannot determine how the law is to be applied by a co-equal trial court, particularly on matters which necessarily require flexibility and the exercise of discretion. "One superior court judge has no power to require another to perform a judicial act . . . the presiding judge is merely one of equals who has been given specific administrative powers, not including the right to administer the records of a coequal judge. [Citation.]" (*Copley Press, Inc. v. Superior Court* (1992)

28

6 Cal.App.4th 106, 116, fns. omitted.)  "The immediate supervision and control of the activities of each trial court is clearly under the control of the judge of that court."  (*Ibid.*, fn. omitted.)

The Protocol's limit of 120 days of detention while a minor receives services directed toward attaining competence provides a laudable goal, but this limit cannot be made binding on the co-equal members of the trial court.  Flexibility is particularly necessary where the finding of incompetency is based on immaturity, rather than the existence of a mental disease defect, or developmental disability, because "[w]hat constitutes a reasonable length of time will vary with the context."  (*In re Mille* (2010) 182 Cal.App.4th 635, 649; see *Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264, 1276, citing *Morrissey v. Brewer* (1972) 408 U.S. 471, 481 ["'"due process is flexible and calls for such procedural protections based on the particular situation"'"].)

We disagree with *Jesus G.*'s conclusion that a fixed 120-day limit on detention while receiving services executes the holdings in *Jackson* and *Davis*, and that it establishes a presumptive due process violation.  *Jackson* expressly declined to define a reasonable period of time, recognizing that flexibility is necessary in this area.  (*Jackson*, *supra*, 406 U.S. at p. 738.)  The Protocol's limit of 120 days of detention is also inconsistent with section 709, subdivision (c)'s command that "all proceedings shall remain suspended for a period of time that is no longer than reasonably necessary to determine whether there is a substantial probability that the minor will attain competency in the foreseeable future."  What period of time is reasonably necessary varies from case to case.  Detention of more than 120 days while receiving services to attain competence is not constitutionally unreasonable where (1) the minor has no mental disease or defect and has an average IQ, (2) an expert opines that the minor would be expected to regain competency within 12 months, (3) the minor is facing delinquency allegations involving weapons and violence, and he is also a dependent child which makes less restrictive placement difficult if not impossible, (4) the court carefully monitored minor's progress,

29

and (5) the possibility of malingering arose early in the proceedings based on statements by the minor's mother and aunt to the probation officer.

**Prejudice**

Assuming there was undue delay without evidence of progress toward attaining competency, or a violation of the Protocol or section 709, no structural error is involved. For the reasons that follow, any error was harmless and reversal is therefore inappropriate.

This appeal follows minor's admissions to the section 602 petitions and the delinquency court's disposition orders after proceedings were reinstituted. This procedural posture is important in establishing the standard of review. Errors "which are not jurisdictional in the fundamental sense shall be reviewed under the appropriate standard of prejudicial error and shall require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error . . . . The right to relief without any showing of prejudice will be limited to pretrial challenges of irregularities." (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 (*Pompa-Ortiz*).) *Pompa-Ortiz* followed the approach taken in other contexts: "In *People v. Wilson* (1963) 60 Cal.2d 139, for example, we held that denial of defendant's right to trial within a prescribed statutory time period was not reversible error on appeal in the absence of a showing of prejudice. If the issue is raised before trial, however, prejudice is presumed and the information is dismissed. (See also *People v. Welch* (1972) 8 Cal.3d 106, 113, and *People v. Salas* (1972) 7 Cal.3d 812, 818-819 [denial of motions to change venue]; also, *People v. Chavez* (1980) 26 Cal.3d 334, where error in refusing representation by attorney of choice, correctable on pretrial application (*Harris v. Superior Court* (1977) 19 Cal.3d 786), was held to compel reversal after judgment only upon a showing of prejudice)." (*Ibid*.)

30

The holding in *Pompa-Ortiz* is consistent with the Supreme Court's view of the limited number of structural errors that are reversible per se. As recognized in *People v. Anzalone* (2013) 56 Cal.4th 545, 554-555, reversal for structural error has been limited to: "adjudication by a biased judge"; "the complete deprivation of counsel"; "the unlawful exclusion of grand jurors based on race"; "the infringement on the right to self-representation"; "the denial of a public trial"; "and the giving of a constitutionally deficient instruction on the reasonable doubt standard." Trial error, which does not result in a miscarriage of justice under article VI, section 13 of the California Constitution, does not merit reversal. (*Id.* at pp. 553-554.)

The decision in *People v. Leonard* (2007) 40 Cal.4th 1370, 1387-1391 (*Leonard*) is particularly instructive. In *Leonard*, the trial court declared a doubt as to the defendant's competence to stand trial and appointed two psychiatrists to evaluate him. The court knew the defendant suffered from epilepsy, but did not appoint the director of the regional center for the developmentally disabled to examine defendant, as required by Penal Code section 1369, subdivision (a). This was error, but not error of a jurisdictional nature "that *necessarily* requires reversal of any ensuing conviction." (*Id.* at p. 1389.) The psychiatrists who did evaluate the defendant in *Leonard* were familiar with his developmental disability and considered it in evaluating his competence, eliminating any prejudice that would otherwise result from a failure to refer the defendant to the regional center. In addition, the error did not implicate the defendant's right to due process of law, because the "defendant's competency trial protected his right not to be tried or convicted while incompetent." (*Id.* at p. 1391; see also *People v. Stewart* (2004) 33 Cal.4th 425, 461-462 [any prosecutorial misconduct resulting from delayed discovery of evidence during the preliminary hearing deemed non-prejudicial on appeal following conviction]; *People v. Dunkle* (2005) 36 Cal.4th 861, 907-910 [error in denial of the defendant's right to self-representation for a year during pretrial proceedings was cured when the defendant subsequently waived this right and proceeded to trial with counsel], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22;

31

*People v. Wilson* (1963) 60 Cal.2d 139, 150-154 [defendant must show prejudice from denial of speedy trial]; *People v. Anderson* (2015) 234 Cal.App.4th 1411, 1420-1421 [constitutionally ineffective assistance of counsel at the preliminary hearing held non-prejudicial after trial with competent counsel]; *In re Christopher F., supra,* 194 Cal.App.4th at pp. 470-471, [failure to refer incompetent minor to the regional center is not reversible error where the doctor performing the evaluation was skilled in the diagnosis of developmental disabilities]; *People v. Becerra* (2008) 165 Cal.App.4th 1064, 1070-1071 [grand jury indictment obtained with perjured testimony held non-prejudicial where prosecution at trial produced evidence from the witness admitting he had lied to the grand jury and there was vigorous cross examination on the perjured testimony]; *People v. Tena* (2007) 156 Cal.App.4th 598, 612-615 [erroneous denial of defendant's *Faretta v. California* (1975) 422 U.S. 806 request at the preliminary hearing deemed harmless where defendant waived the right at trial and proceeded with counsel].)

Minor has not made any showing of actual prejudice due to the length of his detention in regard to his admission to the petitions and the suitable placement disposition. Because the finding of competence is supported by substantial evidence, and minor can point to no actual prejudice resulting from the length of his detention, any error did not result in prejudice within the meaning of Article VI, section 13, of the California Constitution.

### *Equal Protection*

Minor argues that the delinquency court violated his right to equal protection of the law by detaining him for more than 120 days pursuant to section 709 without the procedural protections that would be required for a civil commitment under the Lanterman-Petris-Short Act (LPS). (§ 5000 et seq.) We disagree. Minor is not similarly situated to persons who fall under the LPS Act.

"A prerequisite to a meritorious [equal protection] claim is that individuals 'similarly situated with respect to the legitimate purpose of the law receive like treatment.' (*Gary W.* [(1971)] 25 Cal.3d 296, 303; accord, *In re Lemanuel C.* (2007) 41 Cal.4th 33, 47; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [(*Cooley*)].) Where two or more groups are properly distinguishable for purposes of the challenged law, it is immaterial if they are indistinguishable in other respects. (*Cooley, supra,* at p. 253.) Nor, absent this threshold requirement, is an equal protection inquiry into the justification for any legislative distinction necessary. (See *Gary W.,*[*supra,*] at pp. 304, 306.)" (*People v. Barrett* (2012) 54 Cal.4th 1081, 1107 (*Barrett*).)

The LPS Act applies to persons with a "mental disorder" (§ 5200), "mental health disorder or impairment by chronic alcoholism" (§ 5250), or those who are "gravely disabled as a result of a mental health disorder or impairment by chronic alcoholism" (§ 5350). Under section 709, subdivision (b), a minor may be incompetent to stand trial if the minor "suffers from a mental disorder, developmental disability, *developmental immaturity, or other condition*." (Italics added.) While minors in delinquency proceedings may be subject to both section 709 and the LPS Act in some cases, the laws have different purposes and apply to different mental states. (See *Barnett*, *supra*, 54 Cal.4th at p. 1109 [ the "mental conditions that create eligibility for an extended 180-day LPS Act commitment, though they include imminent dangerousness, do not necessarily imply incompetence or a reduced ability to understand, and make decisions about, the conduct of the proceedings"].)

Here, minor cites to no basis for civil commitment proceedings against him. It is undisputed that he has no mental health disorder, he does not suffer from chronic alcoholism, nor is he gravely disabled. Instead, minor was diagnosed with attention deficit issues and developmental immaturity. As an individual devoid of mental and developmental abnormalities that cause him to be dangerous to himself or others, minor is subject only to section 709, not to the LPS Act. His equal protection argument

33

necessarily fails, because minor is not similarly situated to persons who fall under the LPS Act.

Contrary to minor's argument, *Jackson*, *supra*, 406 U.S. at page 721, does not require a different result. The equal protection violation in *Jackson* was the product of the defendant's indefinite detention while facing a criminal charge with no provision for periodic review, no right to counsel at the competency hearing, and no realistic possibility that Jackson would ever attain competency. Jackson was subject to "a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses . . . ." (*Id*. at 730.) The *Jackson* court held that subjecting Jackson to indefinite confinement without any of the procedural protections that persons who have not been charged with crimes are afforded prior to being institutionalized was a violation of his right to equal protection of the laws. (*Id*. at pp. 728-730.)

The differences between *Jackson* and minor's situation are apparent. Unlike the defendant in *Jackson*, minor had no mental disease or defect, he was expected to attain competency within 12 months, and he was provided counsel and regular reviews of his progress. The suspension of proceedings under section 709 was limited to the time reasonably necessary to attain competency. Moreover, minor was a dependent child under section 300, already under the jurisdiction of the juvenile court, and judicial officers made diligent but unsuccessful attempts to place minor outside of juvenile hall. Here, minor was not similarly situated to persons who fall under the LPS Act, and was also afforded procedural protections not present in *Jackson*. His equal protection rights were not violated.

***Right to Confront Witnesses***

Minor next argues that the court violated his constitutional right to confront witnesses by considering the hearsay statements of a Deputy County Counsel Scolari on

34

behalf the Department, a non-party, at his attainment of competency hearing.  We set forth the background for this contention below.

In a hearing on October 16, 2013, the court expressed concern that minor was consistently scoring 1's in all 14 domains of every test administered by Creative Services. The court stated, "At this time I have no way of knowing whether or not these tests are capable of preventing any malingering issues on the part of any minor that these tests are administered to . . . the court is inclined to appoint the next expert in line . . . for re-evaluation of the minor's competency."  The prosecutor agreed that appointment of an expert for reevaluation would be useful, stating that she was also concerned that minor was not showing progress in his competency training due to malingering.  Later in the hearing, minor's counsel inquired regarding the source of the prosecutor's belief that minor was malingering.  The prosecutor identified Deputy County Counsel Scolari as the source of the information.  With respect to his suspicions that minor was malingering, Scolari explained, "I believe that a couple transcripts have been ordered from two different dependency hearings where [minor] and [the dependency court judge] had discussions that some believe would show this court that he's very aware of what's happening."  The delinquency court thanked Scolari and asked him to provide copies of those transcripts to the court and counsel, as well as the expert who would be appointed to evaluate minor.  Minor's counsel made no objection at that time.  The record does not indicate that the transcripts were lodged.  The court appointed an expert to reevaluate minor's competency.

At a hearing on January 13, 2014, Scolari stated his opinion that minor fully understood the dependency proceedings, informing the court that he believed minor "knows more than I think he's letting on.  I know in my conversations with the supervisor and the social worker on this case who had frequent phone contact with [minor] they have never had any indication whatsoever that he wasn't completely aware of what's going on in his dependency case as well as his delinquency case."  The court later asked Scolari whether it was the Department's position that minor was malingering.  Scolari

35

responded, "Again, talking to the supervisor and the social worker, we've had numerous conversations over the past year with [minor], and they have—and I have also talked to the county counsel . . . in his dependency case . . . and all three of them believe that [minor] clearly understands what is happening in both courtrooms. He . . . discusses the issues with the dependency judge at length and in the conversations that they have had with him he also seems to be on top of what's going on. He knows exactly what his situation is and they think he's—they think [minor] is intelligent and they think he understands what he's doing." The court responded, "And you stated this position several times over as this is not the first appearance that you have made on behalf of [the Department]; is that correct?" Scolari replied: "True. It's always been their opinion that [minor] knows exactly what's happening." Minor's counsel objected to Scolari's participation, because he was not a party to the delinquency proceedings, and also objected to Scolari receiving a copy of Dr. Knapke's report regarding minor's competency. The court invited the parties to submit points and authorities on the issue of whether the Department should be joined in the delinquency proceedings. Minor's counsel filed a Memorandum of Points and Authorities. The record does not contain a memorandum from county counsel or a ruling by the delinquency court.

We reject minor's contention that that consideration of Scolari's statements violated the Confrontation Clause. First, minor made no confrontation clause objection in the court below. The issue is therefore forfeited. (*People v. Redd* (2010) 48 Cal.4th 691, 730.) A timely objection would have allowed the court to easily cure any purported violation of the right to confrontation by the calling of witnesses.[8]

Second, the contention fails on the merits. The right to confrontation is a trial right. (*People v. Miranda* (2000) 23 Cal.4th 340, 350, citing *Whitman v. Superior Court*

---

[8] We also reject minor's contention that the court committed judicial misconduct by allowing Scolari to participate in the proceeding. No objection was made on this ground below, nor do we see any merit to the contention. (*People v. McWhorter* (2009) 47 Cal.4th 318, 373; *People v. Snow* (2003) 30 Cal.4th 43, 77-78.)

(1991) 54 Cal.3d 1063, 1079.)  Consideration, if any, by the delinquency court of a statement by counsel for the Department does not implicate the right to confrontation.

Third, minor did not suffer any prejudice as a result of the statements in dispute. The delinquency court fully explained on the record the basis for its finding that minor was competent to stand trial.  The ruling makes no mention of the statements of Scolari, and it is clear that the court ruled based on the testimony presented and its own observations of minor at the attainment of competency hearing.  Error in allowing Scolari to state the Department's position, if any, did not result in prejudice to minor.

### *Other Contentions*

Minor argues that the delinquency court lacked jurisdiction to order a new competency evaluation and hold an attainment of competency hearing while proceedings were suspended.  According to the contention, neither section 709 nor the Protocol lists the authority to make such orders among the actions the court may take while proceedings are suspended.  We disagree, as the procedures followed were entirely appropriate and necessary in order to determine if minor had attained competency.

It is unclear how minor would suggest that the delinquency court determine whether competency has been attained other than through a new competency evaluation and a hearing on the subject.  If the delinquency court lacks the power to engage in these acts, there will be no means to effectively reinstate proceedings once competency is attained.

Both the Protocol and section 709, subdivision (c) provide that while proceedings are suspended, "the court may make orders that it deems appropriate for services . . . that may assist the minor in attaining competency.  Further, the court may rule on motions that do not require the participation of the minor in the preparation of the motions." While the Protocol is not a statement of law, to the extent minor relies upon it we note that it specifically provides that "[m]inor's counsel or the district attorney may request a

37

further [Juvenile Competency to Stand Trial Panel] evaluation or a full evidentiary hearing." Here, minor's counsel requested a new evaluation several times, and the prosecutor requested an evidentiary hearing.

The purpose of section 709 is to ensure that mentally incompetent minors are not subjected to juvenile delinquency proceedings, and to restore minors to competency as quickly as possible. With that objective in mind, "section 709 clearly intend[s] . . . the reports and/or testimony of experts who have evaluated the defendant for legal competency" to be the center of such a determination. (*In re John Z., supra,* 223 Cal.App.4th at p. 1058.) It is unreasonable to interpret section 709 as precluding the appointment of experts to determine current competency, when the task of the court is to minimize the length of time proceedings are suspended. Reconsideration of minor's competency was not error, and certainly was not error that can be described as structural.

Minor also argues the court acted in excess of jurisdiction because his detention was prolonged without evidence of progress toward attaining competency. We have previously rejected this contention in discussing minor's due process claims. Our earlier discussion disposes of this issue.

### *Probation Conditions*

Probation condition No. 9 provides: "You must go to school each day. You must be on time to each class. You must have good behavior at school. You must receive satisfactory grades." Minor contends that he is incapable of complying with condition No. 9 due to his educational deficiencies, and that the terms "satisfactory grades" and "good behavior at school" are unconstitutionally vague.

**Relevant Law**

A delinquency court "may impose and require any and all reasonable conditions that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced." (§ 730, subd. (b).) "A [delinquency] court enjoys broad discretion to fashion conditions of probation for the purpose of rehabilitation and may even impose a condition of probation that would be unconstitutional or otherwise improper so long as it is tailored to specifically meet the needs of the juvenile. [Citation.] That discretion will not be disturbed in the absence of manifest abuse. [Citation.]" (*In re Josh W.* (1997) 55 Cal.App.4th 1, 5.)

Minor failed to present his claim that the probation condition is invalid because he lacks the capability to comply to the delinquency court, and he has not presented this court with a factual record. However, his challenge to condition No. 9 on vagueness grounds may be addressed on appeal because it presents a "'pure question[] of law that can be resolved without reference to the particular sentencing record developed in the trial court.'" (*In re Sheena K.* (2007) 40 Cal.4th 875, 889 (*Sheena K.*).)

"A probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness. (*People v. Reinertson* (1986) 178 Cal.App.3d [320,] 324-325.)" (*Sheena K.*, *supra*, 40 Cal.4th at p. 890.) "'"It is an essential component of due process that individuals be given fair notice of those acts which may lead to a loss of liberty. [Citations.] This is true whether the loss of liberty arises from a criminal conviction or the revocation of probation. [Citations.] [¶] 'Fair notice' requires only that a violation be described with a "'reasonable degree of certainty'" . . . so that "ordinary people can understand what conduct is prohibited." . . . .'" [Citation.]' (*In re Angel J.* (1992) 9 Cal.App.4th 1096, 1101-1102 [(*Angel J.*)], quoting *In re Robert M.* (1985) 163 Cal.App.3d 812, 816, quoting *Burg v. Municipal Court* (1983) 35 Cal.3d 257, 270-271.)" (*In re Byron B.*

39

(2004) 119 Cal.App.4th 1013, 1018.)  Whether a probation condition is unconstitutionally vague is a question of law reviewed de novo.  (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143; *In re J.H.* (2007) 158 Cal.App.4th 174, 183.)

The meaning of "satisfactory grades" was addressed in *Angel J., supra,* 9 Cal.App.4th 1096.  We agree with the *Angel J.* analysis, and resolve any issue of vagueness by defining "satisfactory grades" as "passing grades in each graded subject," i.e., "not failing, such as D or above in an A through F grading system."  (*Id.* at p. 1102 & fn. 7.)

A similarly straightforward interpretation can be applied to the probation condition that minor maintain "good behavior at school."  The reasonable meaning of such a condition is that minor must follow the rules of behavioral conduct set forth by school personnel.  This definition gives minor fair notice of what is required of him and allows the court to determine if the condition has been violated.  We modify probation condition No. 9 accordingly.

# DISPOSITION

Probation condition No. 9 is modified to provide as follows: "You must go to school each day. You must be on time to each class. You must follow the rules of behavioral conduct set forth by school personnel. You must receive passing grades in each graded subject." In all other respects, the judgment is affirmed.

KRIEGLER, J.

We concur:

MOSK, Acting P. J.

KIRSCHNER, J.[*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.